**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARGO MILLS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-CV-170- KOB** |
| | ) | |
| **CELLCO PARTNERSHIP d/b/a** | ) | |
| **VERIZON WIRELESS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Margo Mills has worked in retail sales for Defendant Verizon Wireless since November 2012. Ms. Mills, an African American female, alleges that, beginning in 2014, her white store manager regularly subjected her and other African American colleagues to racist remarks. She also alleges that the store manager discriminated against her in his scheduling practices and later retaliated against her for complaining about the schedule. When Ms. Mills complained to Verizon, it transferred her to a new store with a new manager; Ms. Mills alleges the discrimination and retaliation continued.

Ms. Mills filed an EEOC charge alleging racial discrimination and retaliation and later filed this lawsuit after receiving her right to sue.

This matter now comes before the court on "Defendant's Motion for Summary Judgment." (Doc. 73). In its motion, Verizon asks this court to enter judgment against Ms. Mills for failing to establish a prima facie case or to raise a genuine issue of material fact on any of her claims. For the reasons stated below, the court will GRANT IN PART Verizon's motion and will ENTER JUDGMENT on Ms. Mills's racially hostile work environment claim; retaliation claim;

1

and negligent hiring, supervision, training, and retention claim. The court will DENY IN PART Verizon's motion for summary judgment on Ms. Mills's racial discrimination claim but only as to her claim that Verizon discriminated against her by unfairly scheduling her and other African American employees for undesirable closing shifts on weekends.

## I. Factual Background

Margo Mills, an African American female, has worked at Verizon in retail sales since November 2012 and continues to work for Verizon. She originally worked at a store in Bessemer but moved to the Trussville store in 2014, where Kerry Gould served as one of her managers.

Ms. Mills alleges Mr. Gould, who is white, subjected her to racial discrimination and racial harassment throughout her time at the Trussville store, creating a racially hostile work environment. Specifically, Ms. Mills alleges Mr. Gould often made racially offensive comments to and around her and other African American employees. She alleges Mr. Gould once approvingly referenced the Ku Klux Klan and expressed interest in attending a Ku Klux Klan meeting. She also alleges Mr. Gould scheduled her and other African American employees for more undesirable weekend closing shifts than the white employees.

Ms. Mills alleges that she and another African American employee complained to Mr. Gould in February or March 2014 about his discriminatory behavior. In response, Mr. Gould placed Ms. Mills in charge of scheduling for one to two months but then reassumed scheduling duties and allegedly continued to disproportionately schedule Ms. Mills and other African American employees for the least desirable shifts.

Ms. Mills alleges Mr. Gould's discriminatory and retaliatory behavior continued throughout 2014 and resulted in a racially divided workplace and tension between Ms. Mills and Mr. Gould. But Ms. Mills did not make a formal complaint to anyone in Verizon's Human

Resources department until December 18, 2014, when she sent an email to several Verizon higher-ups describing Mr. Gould's alleged mistreatment of her and other African American employees. Verizon investigated Ms. Mills's claims and ultimately reassigned her to the Wildwood store, where she began working under manager Angel Burns in January 2015.

According to Ms. Mills, her reassignment did not resolve the issues. In their very first interaction, her new manager Ms. Burns, herself an African American female, allegedly told Ms. Mills that she wanted to help her improve her image by making sure she did not "come off as black and loud." (Doc. 73-1 at 110:20–111:10). As the phrase "black and loud" parroted comments Mr. Gould had allegedly made about Ms. Mills in Trussville, Ms. Mills understood the comment to mean that Ms. Burns knew about Ms. Mills's history with Mr. Gould, including her making formal complaints of racial discrimination. Ms. Mills even testified that Ms. Burns told her that Ms. Pate and Mr. Gould had provided that information about Ms. Mills, but Ms. Burns testified that she did not know anything about Ms. Mills's history at the Trussville store. (Doc. 73-1 at 111:8–10; Doc. 73-11 at 151:13–152:8).

After this inauspicious introduction, Ms. Mills alleges that Ms. Burns discriminated and retaliated against her throughout her time under Ms. Burns's management. Ms. Mills specifically claims that Ms. Burns threatened her with disciplinary action and gave her unfair "coachings," which are internal notes managers keep on employees to identify potential areas of improvement, track progress, and provide positive or negative feedback. The record indicates that Ms. Burns received over fifty coachings during her time under Ms. Burns's management, either from her or from one of the assistant managers at the Wildwood store. (Doc. 73-2 at 1–58).

Ms. Mills would periodically contact Human Resources to complain about Ms. Burns's alleged mistreatment, which she alleges only led to additional retaliatory conduct by Ms. Burns.

Ms. Mills specifically complained that Ms. Burns miscoded her leave time, spoke to her in a derogatory and hostile manner, changed her schedule without proper notice, and followed her around the store to heavily scrutinize her customer interactions.

Ms. Mills filed an EEOC charge of discrimination on September 18, 2015, and requested her right to sue on January 4, 2017. She filed the instant action in this court on February 1, 2017, alleging racial discrimination and a hostile work environment under Title VII and § 1981 (Counts One and Two), retaliation under Title VII and § 1981 (Counts Three and Four), and negligent hiring, supervision, training, and retention under Alabama tort law (Count Five).

**Standard of Review**

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Inferences can create genuine issues of

material fact. *Carlson v. FedEx Ground Package Systems, Inc.*, 787 F.3d 1313, 1318 (11th Cir. 2015).

In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial.*'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added).

The court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the non-moving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254. The court must refrain from weighing the evidence and making credibility determinations because these decisions belong to a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Further, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## II. Discussion

Ms. Mills's complaint includes five counts: (1) Title VII racial discrimination / harassment / hostile work environment; (2) 42 U.S.C. § 1981 racial discrimination / harassment / hostile work environment; (3) Title VII retaliation; (4) 42 U.S.C. § 1981 retaliation; (5) negligent hiring, supervision, training, and retention under Alabama tort law.

As an initial matter, "Title VII and § 1981 claims 'have the same requirements of proof and use the same analytical framework.'" *Chapter7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256–57 (11th Cir. 2012) (quoting *Standard v. A.B.E.L Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). So for the purposes Verizon's motion for summary judgment, the court makes no distinction between Ms. Mills claims arising under Title VII and those arising under § 1981.

*A. Racial discrimination claims*

Ms. Mills's complaint alleges that Verizon discriminated against her on the basis of her race in violation of Title VII and § 1981 by scheduling her for undesirable shifts, subjecting her to unfair discipline, and threatening to discipline her. In response to Verizon's motion for summary judgment, Ms. Mills additionally argued that Verizon denied her the necessary training to receive a promotion.

Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Establishing a prima facie case for discrimination under Title VII requires "showing that the employer acted with discriminatory intent." *Hill v. MARTA*, 841 F.2d 1533, 1538 (11th Cir. 1988). A plaintiff can show discriminatory intent in one of two ways: "He may present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude. Or, in the absence of direct evidence of discrimination, he may rely on the combination of factors set forth in *McDonnell-Douglas Corp. v. Green . . . .*" *Id.*, at 1539.

Ms. Mills presents only circumstantial evidence of racial discrimination, so the court applies the burden-shifting framework of *McDonnell Douglas* to the instant case. Under the *McDonnell Douglas* framework, "the plaintiff must first create an inference of discrimination

through his prima facie case." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

"A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citations omitted). Verizon challenges Ms. Mills's ability to establish that she ever suffered adverse employment action or that she has established that race was a motivating factor for any employment practice.

### 1. Adverse employment action

"Courts have uniformly read [Title VII] to require a plaintiff suing under § 2000e-2(a) to establish, as part of his prima facie case, that he suffered so-called 'adverse employment action.'" *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001) (citing *Merriweather v. Alabama Dept. of Pub. Safety*, 17 F. Supp. 2d 1260, 1274 (M.D. Ala. 1998), *aff'd* 199 F.3d 443 (11th Cir. 1999)). Verizon argues that Ms. Mills has failed to establish that she ever suffered adverse employment action. (Doc. 74 at 14–25).

To qualify as adverse employment action, "the employer's action must impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Davis*, 245 F.3d at 1239 (internal quotation marks omitted). The impact must be "serious and material," and a reasonable person in the circumstances presented must have found that the action was materially adverse. *Id.*

Ms. Mills's complaint alleges that she suffered adverse employment action when her manager at the Trussville store scheduled her to work undesirable weekend closing shifts more often than her white coworkers. (Doc. 1 at ¶ 18; *see also* Doc. 73-1 at 195:10–12). Verizon has

not pointed to anything in the record conclusively contradicting Ms. Mills's allegations that her manager favored white employees with preferable schedules. Instead, Verizon points to Fifth Circuit precedent for the assertion that "changing one's work schedule is not a change in employment status." (Doc. 74 at 16) (quoting *Watts v. Kroger Co.*, 170 F.3d 505, 510 (5th Cir. 1999)). Verizon also asserts that courts "have consistently held that complaints of unfair scheduling do not meet the threshold for an objectively adverse employment action," citing an unpublished Eleventh Circuit case and an unpublished case from the Northern District of Alabama. (Doc. 74 at 16) (citing *Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 893–94 (11th Cir. 2015)); *Tetteh v. WAFF TV*, No. 5:11-CV-825-JHE, 2014 WL 8382827, *16 (N.D. Ala. May 14, 2014), *report and recommendation adopted*, 2015 WL 1419043 (N.D. Ala. Mar. 27, 2015), *aff'd* 638 F. App'x 986 (11th Cir. 2016)).[1] But these cases are distinguishable.

The plaintiff in *Clark* alleged that she received twelve night-shifts in one month instead of her requested fourteen but did not allege that she was dissatisfied with her shift assignments on any other occasion. *Clark*, 601 F. App'x at 893. The court concluded that the "difficulties and vagaries of accommodating . . . shift preferences in any given month" prevented this isolated incident from rising to the level of materially adverse employment action. *Id.* By contrast, Ms. Mills alleges that her manager consistently scheduled her for weekend closing shifts, exhibiting a pattern of discrimination against her and other African American employees. (Doc. 73-1 at 195:10–12).

The decision in *Tetteh* is also distinguishable. Verizon quotes the following language from Magistrate Judge John England III's report and recommendation: "Being required to follow your supervisor's schedule and being required to work sixteen consecutive days are not

---

[1] The court notes that, in *Tetteh v. WAFF TV*, neither the Memorandum Opinion adopting the report and recommendation nor the Eleventh Ciruit Opinion affirming the District Court addresses when or if scheduling decisions can constitute materially adverse employment actions.

materially adverse . . . ." (Doc. 74 at 16). But Verizon's ellipsis conceals important qualifying language, as Judge England finishes the quoted proclamation with "*considering the circumstances of Tetteh's position*." *Tetteh*, 2014 WL 8382827, at *16. Judge England then goes on to describe why "*someone in Tetteh's position* would be required to work a demanding" schedule. *Id.* (emphasis added). Here, Verizon has failed to articulate why the circumstances of Ms. Mills's position might require her to work a disproportionate number of weekend closing shifts.

Moreover, the *Tetteh* opinion has limited applicability to Ms. Mills's allegation. At best, *Tetteh* stands for the proposition that asking an employee to work *too much* does not constitute an adverse employment action, but the opinion says nothing about whether consistently favoring some employees over others for more preferable shifts could constitute an adverse employment action.

Though Ms. Mills's allegedly unfavorable schedule did not reduce her compensation, this court concludes that a jury could find that having to work more than her fair share of weekend closing shifts constitutes a material change to "the terms, conditions, or privileges of employment." That is, the terms, conditions, or privileges of employment could reasonably include an employee's expectation that the workload will be allocated equally among all employees in the same position. So the court concludes that a genuine issue of material fact exists as to whether Ms. Mills suffered adverse employment action by having to work more weekend closing shifts than her coworkers.

Ms. Mills also alleges that she suffered adverse employment actions when her managers unfairly disciplined her and threatened to discipline her. (Doc. 73-1 at 61:10–62:14). She specifically points to allegedly unfair coachings and two incidents with two different managers.

Although in unreported cases, the Eleventh Circuit has indicated that workplace discipline and reprimands do not typically constitute adverse employment actions unless coupled with evidence that the alleged discipline impacted the plaintiff's salary, title, position, or job duties. *See, e.g.*, *Summerlin v. M & H Valve Co.*, 167 F. App'x 93, 97 (11th Cir. 2006) ("The reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result."). This court has also explained that "negative evaluations are only adverse actions when a link can be shown between the review and an alteration of the terms of employment." *Hill v. Branch Banking and Trust Co.*, 264 F. Supp. 3d 1247, 1260 (N.D. Ala. 2017) (Bowdre, C.J.).

Ms. Mills has not provided any such link. Ms. Mills speculated in her deposition that the coachings factored into her performance reviews and could have kept her from larger pay raises or promotions. (Doc. 73-1 at 67:7–20). But she admitted in her deposition that she does not actually know if or how the coachings impacted her performance reviews or compensation. (Doc. 73-1 at 69:5–15). She has not provided any evidence substantiating her conclusory allegation that they did. Moreover, the coachings in the record are overwhelmingly positive, and she has not received any negative performance evaluations as a result of them. So Ms. Mills has failed to establish that the coachings she received qualify as adverse employment actions.

Ms. Mills's allegations about two managers threatening to discipline her similarly fail. Ms. Mills acknowledged in her deposition that she never received any formal discipline, whether verbal or written, and has not pointed to a single alteration of the terms of her employment as a result of these managers threatening to discipline her. The court concludes that Ms. Mills's managers' *threats* of discipline did not constitute adverse employment actions.

Finally, Ms. Mills alleges that her managers removed her from and denied her entry to management training programs. These allegations do not appear anywhere in Ms. Mills's complaint, but she testified extensively about the subject during her deposition. (Doc. 73-1 at 31:22–59:7). So, despite Verizon's argument to the contrary, this court concludes that Ms. Mills properly pled these allegations of discriminatory conduct. (*See* Doc. 117 at 15). Verizon does not appear to dispute that removing Ms. Mills from or denying her access to a management training program would constitute an adverse employment action, so the court concludes Ms. Mills has sufficiently alleged that element of her prima facie case.

### 2. Motivating factor

Title VII requires that a plaintiff demonstrate that her race "was a motivating factor for any employment practice, even though other factors also motivated the practice." § 2000e-2(m). Under the *McDonnell Douglas* framework, a plaintiff can satisfy her burden by pointing to similarly situated employees outside her protected class, so-called "comparators," who did not suffer the same adverse employment action. *See B/E Aerospace*, 376 F.3d at 1091. As the Eleventh Circuit recently clarified, to be a valid comparator, an employee must be similarly situated "in all material respects" but need not be "nearly identical" to the plaintiff. *Lewis v. Union City, Ga.*, No. 15-11362, 2019 WL 1285058, at *2 (Mar. 21, 2019) (en banc).

Here, Ms. Mills not only alleges that she had to work more undesirable shifts than her coworkers—she alleges that she *and other African American employees* had to work more undesirable shifts *than the white employees*. The white and African American employees all had the same rank and position and were all under the jurisdiction of the same supervisor who determined the schedules. And Verizon has not pointed to anything in the record indicating that any employee had more or fewer responsibilities than the others. Stated differently, the white

employees appear to be similarly situated in all material respects to Ms. Mills. *See Lewis*, 2019 WL 1285058, at *9.

Verizon has not pointed to any evidence that definitively contradicts Ms. Mills's allegation of scheduling disparities, which she included in her complaint and testified to in her deposition. Instead, Verizon argues that the allegation "is too vague and speculative" and that none of her manager's alleged racial comments related to scheduling. (Doc. 74 at 25). The court disagrees. Ms. Mills has personal knowledge of her store's shift schedule, so the allegations are not speculative. And while Ms. Mills has not provided copies of the shift schedules to substantiate her claim, her allegations refer to particular types of shifts (weekend closing shifts) during a particular time period (2014) at a particular branch (Trussville store). The court does not agree that these allegations are vague.

Finally, while Ms. Mills does not allege that her manager made racial comments related to scheduling, plaintiffs may use the *McDonnell Douglas* framework to create an inference of discrimination even in the absence of such direct evidence. Having determined that a jury could find unfair scheduling to constitute adverse employment action and that Ms. Mills has alleged facts showing disparity among white and African American employees, the court concludes that Ms. Mills has created an inference of discriminatory intent as to her unfair scheduling claim.

Ms. Mills also alleges that her race motivated Verizon's decision to deny her access to management training programs. But she has failed to produce *any* evidence, circumstantial or direct, that Verizon denied her this access *because of her race*. She merely speculates that her race motivated the action and offers no comparator under the *McDonnell Douglas* framework to establish a prima facie case. Ms. Mills argues that "Defendant offered no evidence of why it denied Mills this training." (Doc. 106 at 38). But this argument ignores her initial burden of

creating an inference of discrimination. *See Vessels*, 408 F.3d at 767 ("Under the familiar *McDonell Douglas* framework, the plaintiff must first create an inference of discrimination through his prima facie case."). Having failed to do that, Verizon bears no obligation to provide a legitimate, non-discriminatory reason for denying Ms. Mills access to management training programs. Thus, her claim that Verizon denied her access to training *because of her race* fails.

So the court concludes that Ms. Mills has established a prima facie of racial discrimination case only as to her claim that her manager disproportionately scheduled her and other African American employees for undesirable weekend closing shifts.

### 3. Legitimate, non-discriminatory reason and pretext

Once a plaintiff establishes her prima facie case of discrimination, the defendant then bears the burden to articulate a non-discriminatory basis for its employment action. *Vessels*, 408 F.3d at 767 (11th Cir. 2005) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "If the employer meets this burden, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

Verizon argues that Ms. Mills's claims "fail as a matter of law because Mills cannot meet the proffered reasoning for her schedules 'head on and rebut it' with evidence that the scheduling was pretext for discrimination." (Doc. 74 at 26). But Verizon confusingly never proffers any *reason* for Ms. Mills to rebut. The closest Verizon comes to offering a non-discriminatory reason is that schedules are "auto-populated" by a computer program, but the schedules are then *modified* according to store needs and employee requests. Verizon does not point to any specific store needs or employee requests that would justify modifications that Ms. Mills has alleged

consistently favored white employees and disfavored African American employees. Verizon also points out that when Ms. Mills complained to her manager about the unfair schedules, he placed her in charge of scheduling for some period of time no shorter than a month.

This court acknowledges that the gesture of placing Ms. Mills in charge of scheduling could support a non-discriminatory reason as being non-pretextual. But without offering a non-discriminatory reason for that gesture to support, Verizon asks this court to remove the inference of discrimination based solely on conduct that took place *after* the alleged discrimination occurred. This court declines to do so.

For the reasons stated above, this court will DENY Defendant's motion for summary judgment as to Ms. Mills's claim that Verizon unlawfully discriminated against her when her manager scheduled her for more weekend closing shifts than her white coworkers.

### B. Racial harassment / hostile work environment claims

Ms. Mills's complaint also alleges that Verizon subjected her to a hostile work environment. To establish such a claim, a plaintiff must show:

> (1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002). Verizon argues that Ms. Mills has not alleged harassment severe or pervasive enough to alter the terms and conditions of her employment. For the reasons discussed below, the court agrees and will GRANT Verizon's motion for summary judgment as to Ms. Mills's hostile work environment claim.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The court considers the follow factors in evaluating whether conduct is severe or pervasive enough to create an objectively hostile or abusive work environment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1275. Courts must employ common sense and "an appropriate sensitivity to social context" when determining whether a plaintiff has alleged facts that a jury could reasonably find created an objectively hostile or abusive work environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

Ms. Mills alleges her manager in Trussville, Kerry Gould, subjected her to *daily* racial remarks and negative treatment throughout 2014. Specifically, Ms. Mills alleges the following:

- Gould said he "felt like KKK was one of the greatest organizations anyone could ever be in"
- Gould said he would go to more KKK meetings if he knew exactly where they were
- Gould said that black people come off as being hood
- Gould called Mills "black and loud" numerous times
- When black customers came in the store, Gould directed the black employees to wait on them, and he would say that he saw the black customers as fraud risks
- Gould said black employees used ebonics language that would not work well with corporate America
- In reference to the black employees, Gould said he wanted to change the vernacular of the store.
- Speaking about President Barak Obama, Gould said "he's just for the black people. He just wants to get in so all the blacks can get on food stamps and welfare."
- Gould asked Mills if Cedric Atchison, Black employee, was a drug dealer because he drove an expensive car.
- Gould commented about Atchison's fiancé, who is white, how does she end up getting with him? What made her choose him? That white girl

> want that black guy? She want a black guy? She don't look like she would
> be the person to do that.

(Doc. 106 at 31–32).

Ms. Mills also points to Mr. Gould's allegedly discriminatory scheduling practices and alleges that Mr. Gould "used a hostile and derogatory tone of voice when addressing Black employees but was polite when speaking to white employees." (Doc. 106 at 33). Finally, Ms. Mills alleges Angel Burns, her manager beginning in January 2015, told Ms. Mills she wanted to help her from "com[ing] off as black and loud." (Doc. 73-1 at 267:13–19).

Verizon argues the infrequency of the alleged conduct weighs against this court considering it pervasive enough to create an objectively hostile or abusive work environment. According to Verizon, "Mills's allegations of eight comments by Gould in 2014 and one alleged comment by Burns at the beginning of 2015 are far from 'pervasive[.]'" (Doc. 74 at 35). Verizon also asks this court to disregard Ms. Mills's "vague allegation that Gould made unspecified 'racist statements every day[.]'" (Doc. 117 at 20) (citing *Alexander v. Opelika City Schs.*, 352 F. App'x 390, 393 (11th Cir. 2009)).

In *Alexander*, the Eleventh Circuit noted "there was not sufficient evidence presented for a reasonable person to conclude that the harassment was frequent," because the plaintiff "could only recall eight specific instances [of racial comments] over the course of two years." 352 F. App'x at 393. But this court hesitates to rely too heavily on this unreported opinion for two reasons. First, the Eleventh Circuit has at least partially relied on similarly "vague" testimony to affirm a trial court's finding of a racially hostile work environment. *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 n. 6 (11th Cir. 1990) ("There was testimony that [racially offensive] comments and incidents occurred 'daily.'"). Second, in *Alexander*, the court only noted that the plaintiff testified as to the frequency of the comments and could recall just eight specific

instances. 352 F. App'x at 393. Here, although Ms. Mills can similarly recall only nine specific incidents (eight involving Mr. Gould), her coworkers at the relevant times echo the allegation that Mr. Gould *frequently* made racially offensive comments. (Docs. 73-24 at 14:14–19; 103-4 at 177:10–16; 104-6 at 133:5–11). So the court concludes that Ms. Mills has sufficiently alleged frequent conduct for the purposes of analyzing whether the conduct could create an objectively hostile work environment.

But the three remaining factors used to determine whether conduct is objectively severe or pervasive weigh against Ms. Mills. "Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult." *Hollingsworth v. O'Reilly Auto. Stores, Inc.*, No. 4:13-CV-1623, 2015 WL 412894, at *13 (N.D. Ala. Jan. 30, 2015) (Bowdre, C.J.) (citing *Miller*, 277 F.3d at 1276–77)). The alleged conduct here simply did not rise to the level necessary to give rise to a viable Title VII claim.

Of the alleged comments, Mr. Gould's allegedly approving references to the Ku Klux Klan do strike this court as the types of comments that could be objectively severe because of their capacity to intimidate an employee, especially an African American. But Ms. Mills's testified that both of Mr. Gould's comments about the KKK occurred during a single conversation, very early in her time working under his management. (Doc. 73-1 at 163:4–22). Ms. Mills also testified that Kathy Williams, another African American employee who heard the comments, responded by taking Mr. Gould aside and explaining to him that he, as the manager, could not make such comments about the KKK. (Doc. 73-1 at 165:13–22). Ms. Mills also specifically testified that she did not feel physically threatened at the time Mr. Gould made these comments but rather "felt hurt [she] was working with a racist." (Doc. 73-1 at 166:10–15). Ms. Mills did not testify that Mr. Gould ever made any subsequent comments about the KKK from

that day forward, positive or negative, although he allegedly continued to make racially offensive comments generally.

While offensive and potentially threatening, Mr. Gould's single incident of making allegedly approving comments about the KKK fails to create an objectively hostile work environment, because Mr. Gould never made any subsequent reference to the KKK or any other potentially threatening comments. The record instead indicates that Ms. Williams's rebuke was effective in communicating that such comments were flatly inappropriate. The only other KKK-related incident Ms. Mills alleges involved her asking Mr. Gould whether he allowed a white employee to leave early every Tuesday to attend KKK meetings. (Doc. 73-1 at 173:11–174:11). Mr. Gould allegedly declined to answer her question at all, instead responding, "Oh Margo." (Doc. 73-1 at 174:12–20). But Mr. Gould was under no obligation to provide Ms. Mills with information about how the white employee spent his Tuesday evenings, and his refusing to do so is hardly sufficient to create an objectively hostile or abusive work environment.

Except for the isolated KKK comments, none of Ms. Mills's other allegations are severe enough to create a racially hostile work environment under Title VII. In fact, the Eleventh Circuit has affirmed summary judgment against a racially hostile environment claim when plaintiffs alleged conduct worse than Ms. Mills's alleges in the instant case. *See Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57–58 (11th Cir. 2005). In *Barrow*, African American plaintiffs alleged that they saw Confederate flag stickers, the letters "KKK," and a noose at work on several different occasions. *Id*. And one plaintiff alleged that his superintendent called him a particularly egregious racial epithet three times and "boy" repeatedly. *Id*. If the conduct alleged in *Barrow* falls short of being severe enough to create a racially hostile work environment, so too must the conduct Ms. Mills has alleged here.

So the court concludes that a jury could not reasonably find that Mr. Gould's repeated racial statements, including approving references to the KKK, were severe and pervasive enough to create hostile work environment under Title VII. The court will GRANT Verizon's motion for summary judgment on Ms. Mills's racially hostile work environment claim.

*C. Retaliation claims*

Ms. Mills also alleges that Verizon engaged in retaliatory conduct against her after she complained about race discrimination, harassment, and retaliation. Like claims of racial discrimination, Title VII retaliation claims based on circumstantial evidence are governed by the *McDonnell Douglas* framework. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). A plaintiff can establish a prima facie case of retaliation by showing that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Once the plaintiff meets this burden, the employer has an opportunity to articulate a legitimate non-retaliatory reason for its employment action, which the plaintiff can rebut with evidence of pretext. *Brown*, 597 F.3d at 1181–82.

Verizon does not dispute that Ms. Mills has engaged in activity protected under Title VII. Verizon instead argues that Ms. Mills has failed to establish that she suffered any adverse employment action, and, alternatively, that she has failed to make any causal connection between any adverse employment action and her engaging in protected activity. While her race discrimination and retaliation claims feature considerable factual overlap, the court's analysis differs for each because the standard for what constitutes adverse employment action in the retaliation context differs from the standard in the Title VII discrimination context.

To establish an adverse employment action in the retaliation context, a plaintiff must show that the employer's action would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). Whether an employment action qualifies as adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 70–71.

The Eleventh Circuit has recognized that the *Burlington* decision "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to [her] and thus constitute adverse employment actions." *Crawford*, 529 F.3d at 973–74, n. 13 (citing *Burlington*, 548 U.S. at 68). "In deciding whether employment actions are adverse, [the court] consider[s] the employer's acts both individually and collectively." *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005).

Ms. Mills's allegations of retaliation can be divided into two timeframes: (1) retaliation at the Trussville store during 2014 for complaints she made directly to her manager Mr. Gould, and (2) retaliation at the Wildwood store beginning in January 2015 for several formal complaints starting with an email she sent to Human Resources on December 18, 2014.

### 1. Retaliation at Trussville store

Ms. Mills alleges she complained to Mr. Gould several times throughout 2014 that he unfairly scheduled her and other black employees for a disproportionate number of undesirable weekend closing shifts. After a one-to-two month period during which Mr. Gould placed Ms. Mills in charge of scheduling, she alleges that he subsequently took that responsibility away

from her and retaliated against her by again scheduling her for undesirable shifts and removing her from a management training program.

a. Undesirable shift assignments

The court noted above that a jury could reasonably find that undesirable shift assignments constitute adverse employment action for Title VII race discrimination purposes, and the same analysis applies here. But Ms. Mills's claim that she suffered this adverse employment action *because she complained to Mr. Gould* must fail; she presented no evidence, direct or circumstantial, showing a causal connection between the protected activity and the adverse employment action. While Ms. Mills indicated that African Americans, herself included, received more undesirable shifts than white employees, she never alleged or testified that she received *more* undesirable shifts than employees who had never complained about racial discrimination. She has also not alleged that her rate of working undesirable shifts increased after she started complaining. In fact, Mr. Gould initially responded to her scheduling complaints by placing her in charge of scheduling for the store. So this court concludes Ms. Mills cannot rely on unfair scheduling as an adverse employment action for her retaliation claim.

b. Denial of access to management training programs

Ms. Mills's claim that her managers retaliated against her by removing her from and denying her access to management training programs fails for the same reason. The court already discussed that Ms. Mills failed to produce any evidence connecting her alleged exclusion from the programs to a racially discriminatory purpose. The same analysis applies in the retaliation context—Ms. Mills's naked assertions, absent any other evidence whatsoever, that her complaints about racial discrimination motivated her exclusion from training programs are simply insufficient to establish a causal link between her protected activity and the adverse

employment action. In fact, the record does not even clearly indicate that the supposed retaliatory conduct came *after* she complained about Mr. Gould's behavior. Ms. Mills has failed to establish a prima facie case that Verizon retaliated against her by denying her access to training programs.

2. Retaliation at Wildwood store

Ms. Mills made her first formal complaint to Verizon's Human Resources department on December 18, 2014, when she emailed her complaints about Mr. Gould's alleged racial comments and discriminatory treatment. Ms. Mills moved to a different store location in Wildwood in January 2015. Her remaining allegations of retaliation come from her time working at Wildwood and predominantly stem from conduct by her manager Angel Burns. Specifically, Ms. Mills alleges Ms. Burns retaliated against her by threatening to discipline her, subjecting her to unfair coachings, miscoding her leave time, scheduling shift changes without properly notifying her, and following her around the store to heavily scrutinize her.

a. Unfair coachings

Ms. Mills alleges that Ms. Burns gave her unfair coachings as retaliation for filing a complaint against Mr. Gould and later for repeatedly filing claims against Ms. Burns. Ms. Mills alleges these unfair coachings "limited the amount of a raise she could receive," although Verizon disputes whether the coachings had any effect on Ms. Mills's compensation. (Doc. 106 at 39).

Verizon argues that the allegedly unfair coachings do not constitute adverse employment action because they are overwhelmingly positive. (Doc. 74 at 13 n. 4). The record indicates that Ms. Mills received over fifty coachings but that almost all of them were neutral or even positive. Upon the court's review, the only coachings even somewhat critical of Ms. Mills include (1) a suggestion on how to upsell a customer a tablet, (doc. 73-2 at 14); (2) a comment that Ms. Mills

had "made strides in addressing her verbiage with customers," perhaps suggesting a prior problem, (doc. 73-2 at 18); (3) an insinuation that Ms. Mills did not spend enough time on the sales floor and too much time behind the sales counter, (doc. 73-2 at 21); (4) a comment that Ms. Mills handled a customer interaction perfectly except for "not approaching the floor manager first or taking the name out [of] the queue," (doc. 73-2 at 40); and (5) a summary of a customer interaction in which the customer did not like Ms. Mills's tone, (doc. 73-2 at 42). The remainder of the coachings are universally positive or, at worst, neutral. And most of the potentially critical coachings also include positive comments. (Doc. 73-2 at 14) ("Margo was very polite with the customer and did her best to address the customers [sic] issue as he was escalating as soon as he walked in the door. . . . After a few minutes of this the customer saw she was helping him and cooled down a bit.").

Far from being materially adverse, the court cannot even infer that these coachings amount to action *against* Ms. Mills at all. Title VII's anti-retaliation provision does not protect employees from superiors' occasional constructive—and even negative— feedback. So Ms. Mills's contention that these coachings constituted adverse employment action must fail as a matter of law.

### b. Threats of discipline

Ms. Mills also alleges she suffered retaliation when Ms. Burns twice verbally threatened to discipline her for negative customer interactions. (Doc. 73-1 at 126:12–127:6). Ms. Mills alleges Ms. Burns gave her a negative coaching both times, coupled with an indication that subsequent incidents could result in formal discipline.[2]

---

[2] Ms. Mills's testimony is not clear on which coachings involved the threats. The record indicates only one negative coaching about a specific customer interaction in April 2015 and another vague but seemingly negative coaching in late June 2015 about "proper expectations for interacting with a customer." (Doc. 73-2 at 21, 42).

Verizon contends that, as a matter of law, unfulfilled threats of discipline cannot serve as the basis of a retaliation claim, but the court disagrees. (*See* Doc. 74 at 19–22). To support its argument, Verizon chiefly relies on opinions from the Seventh Circuit and opinions from the Eleventh Circuit that pre-date the Supreme Court's decision in *Burlington*. For example, Verizon cites *Summerlin v. M & H Valve Co.*, in which the Eleventh Circuit stated: "To be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must either be an ultimate employment decision or else must meet some threshold level of substantiality." 167 F. App'x 93 (11th Cir. 2006) (citing *Stavropoulos v. Firestone*, 361 F.3d 610, 616–17 (11th Cir. 2004)).

But in *Crawford*, the Eleventh Circuit recognized that "the *Burlington* Court effectively rejected the standards applied by this court in both *Stavropoulos* and *Gupta* that required an employee to show either an ultimate employment decision or substantial employment action to establish an adverse employment action for the purpose of a Title VII retaliation claim." 529 F.3d at 973–74 (11th Cir. 2008). So, applying the more liberal *Burlington* standard, threats of discipline qualify as precisely the type of employment action an employer might use to dissuade a reasonable worker from making or supporting a charge of discrimination.

But Ms. Mills fails to meaningfully distinguish her allegations of Ms. Mills's "threats" with her allegations of "unfair coachings." And even assuming Ms. Burns's alleged threats of discipline rise to the level of materially adverse employment actions, Ms. Mills has failed to causally connect the threats to any protected activity. She could not remember the specific dates of the threatened discipline and makes no attempt to tie them to the protected activity by temporal proximity. The language of the coachings indicates that specific interactions with customers prompted the alleged threats of discipline, rather than Ms. Mills's engaging in

protected activity. And Ms. Mills has not offered any evidence, direct or circumstantial, to contradict those indications, such as proximity to protected activity or disparate treatment of employees who had not engaged in protected activity. Instead, Ms. Mills simply offers conclusory allegations that the threatened discipline was retaliatory. Such conclusory allegations cannot establish retaliatory intent, so Ms. Mills's allegations that she suffered retaliation in the form of threats of discipline must fail as a matter of law.

c. Miscoded time, written consent, schedule change, and heavy scrutiny

Ms. Mills alleges she also suffered retaliation in the form of one instance of miscoded leave time, one instance of Ms. Burns requiring written consent before approving a shift swap, and one instance of Ms. Burns changing her schedule without proper notice to her. Ms. Mills also alleges Ms. Burns followed her around the store and scrutinized her customer interactions much more closely than other employees. But such workplace grievances, even taken collectively, would not be sufficient to dissuade a reasonable employee from engaging in protected activity.

In an unreported opinion, the Eleventh Circuit noted that "glaring, slamming a door in an employee's face, inquiring into retirement plans, commenting that an employee is not a team player, blaming an employee for failed union negotiations, or harboring concerns over an employee's dependability and trustworthiness are not actions that would dissuade a reasonable worker from making or supporting a charge of discrimination." *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 778 (11th Cir. 2014). Such appears to be the case here.

Ms. Mills's complaint about Ms. Burns following her around the store resembles the complaint about "glaring," which the Eleventh Circuit indicated is insufficient. *Smith*, 565 F. App'x at 778. And while Ms. Mills's remaining allegations of retaliation appear to be isolated

incidents or mistakes, the conduct alleged in *Smith* appeared to intentionally target the plaintiff. *Id.* The court finally notes that, as with her previous allegations of retaliation, even if Ms. Mills had alleged materially adverse employment action, she has failed to provide anything more than conclusory allegations of a causal connection between the conduct and her protected activity.

The court concludes Ms. Mills has failed to establish a prima facie case for her retaliation claim under Title VII and will GRANT Verizon's motion for summary judgment on Ms. Mills's retaliation claim.

### D. Negligent hiring, supervision, training, and retention claims

Ms. Mills's complaint finally alleges that Verizon "negligently hired, trained, supervised and retained Caucasian employees and/or supervisory employees who subjected Plaintiff to racial discrimination, racial harassment, a racially hostile environment, and retaliation." (Doc. 1 at ¶ 325). Verizon moves this court to dismiss Ms. Mills's negligence claim, arguing that a plaintiff can only bring such a claim when an employee has committed a *state law* tort. (Doc. 74 at 36).

Alabama law provides a cause of action when an employer negligently hires, supervises, trains, or retains an employee who commits a tortious act against someone. *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) (citing *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999)). But for the employer to be liable, the employee's conduct must be considered tortious under Alabama law. *Id.* The Alabama Supreme Court has recognized an exception to this rule in the sexual harassment context, holding that "the manner in which a sexual-harassment complaint is handled when sexual harassment has, in fact, occurred, could form the basis for a claim for negligent or wanton supervision." *Stevenson v.*

*Precision Standard, Inc.*, 762 So. 2d at 825; *see also Andazola v. Logan's Roadhouse, Inc.*, 871

F. Supp. 2d 1186, 1225–26 (N.D. Ala. 2012) (recognizing the sexual harassment exception).

No similar exception exists in the racial harassment context. In fact, Judge C. Lynwood

Smith, Jr. explicitly ruled to the contrary:

> Here, plaintiff's claim for negligent hiring, training, supervision, and retention is
> based entirely on the same alleged conduct that supports her claims for race
> discrimination, hostile work environment, and retaliation under Title VII and 42
> U.S.C. § 1981. Plaintiff does not allege any *independent* conduct that would
> support an Alabama tort law claim. Accordingly, her negligent hiring, training,
> supervision, and retention claim must be dismissed.

*McCaulley v. Harvard Drug Grp., LLC*, 992 F. Supp. 2d 1192, 1199 (N.D. Ala. 2014) (emphasis

in original) (footnote omitted). But Ms. Mills now asks this court to expand the sexual

harassment exception to include claims of racial harassment as well. (Doc. 106 at 35–37). Ms.

Mills has not cited a single example of another court, state or federal, similarly expanding the

scope of negligent hiring, training, supervising, and retention claims.

The court notes that while Alabama law does not recognize an independent cause of

action for sexual harassment, plaintiffs can effectively bring sexual harassment claims under

common-law tort theories such as assault and battery, invasion of privacy, and outrage. *See*

*Stevenson v. Precision Standard, Inc.*, 762 So. 2d at 825 n. 6. The court knows of no analogous

Alabama tort for racial harassment claims. Given this important distinction between sexual and

racial harassment claims, along with the complete lack of precedent for expansion, this court

declines to create an exception to Alabama law to allow Ms. Mills's claim that Verizon

negligently hired, trained, supervised, and retained employees who allegedly subjected her to

racial discrimination and harassment.

The court will GRANT Verizon's motion for summary judgment on Ms. Mills's

negligence claim.

### III. Conclusion

For the reasons discussed, the court will GRANT IN PART and DENY IN PART Verizon's motion for summary judgment. The court will DENY Verizon's motion for summary judgment on Ms. Mills's claim that Verizon violated Title VII and § 1981 when its manager racially discriminated against her by scheduling her for a disproportionate number of closing shifts on weekends. The court will GRANT Defendant Verizon's motion for summary judgment as to Ms. Mills's alternative claims of racial discrimination and will ENTER PARTIAL JUDGMENT for Verizon and against Ms. Mills on those claims. The court will GRANT Defendant Verizon's motion for summary judgment on Plaintiff Margo Mills's claims of a racially hostile work environment and will ENTER JUDGMENT for Verizon and against Ms. Mills on Counts One and Two of the complaint, as those counts relate to racially hostile work environment claims. The court will GRANT Verizon's motion for summary judgment on Ms. Mills's claims of retaliation under Title VII and § 1981 and will ENTER JUDGMENT for Verizon and against Ms. Mills on Counts Three and Four of the complaint. Finally, the court will GRANT Verizon's motion for summary judgment on Ms. Mills's negligence claim and will DISMISS WITHOUT PREJUDICE Count Five of the complaint.

**DONE** and **ORDERED** this 26th day of March, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE